## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| KEVIN CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  15-722-RGA-MPT |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This action arises from the denial of Kevin Conley's ("plaintiff") claim for Social

Security Benefits.  On June 4, 2012, plaintiff filed a Title II application for Social Security

Disability Insurance Benefits ("DIB") alleging his disability began on December 2, 2010.[1]

The claim was initially denied on September 10, 2012, and upon reconsideration on

March 1, 2013.[2]  Following these denials, plaintiff filed a written request for a hearing

before an Administrative Law Judge ("ALJ") on April 8, 2013 pursuant to 20 C.F.R. §

404.929.[3]  In his application and disability report, plaintiff alleged he became disabled on

December 2, 2010, due to a traumatic brain injury ("TBI"), back, neck, and shoulder

injuries, posttraumatic stress disorder ("PTSD"), bouts of severe depression, anxiety,

hypervigilance, irritability, socially inappropriate behavior, bladder and bowel

---

[1] D.I. 4-3 at 14.
[2] *Id.*
[3] *See* D.I. 4-3 at 14; *see also* 20 C.F.R. § 404.929.

incontinence, a torn meniscus in his right knee, bilateral carpal tunnel syndrome, bilateral bunions, and trouble with short term memory.[4]  At the administrative hearing, testimony was provided by plaintiff, plaintiff's wife, and an impartial vocational expert ("VE"), Christina Cody.[5]  On November 22, 2014, the ALJ, William Kurlander, issued a written decision denying plaintiff's claims.[6]  The appeals council subsequently denied plaintiff's request for review.[7]  On January 19, 2016, plaintiff filed a timely appeal with the court.[8]  Presently before the court are the parties' cross-motions for summary judgment.[9]  For the reasons that follow, the court will deny defendant's motion for summary judgment, deny plaintiff's motion for summary judgment and remand the case for further findings consistent with plaintiff's 12-month disability period and this opinion.

## II.    BACKGROUND

Plaintiff was born on October 29, 1970.[10]  Plaintiff's alleged disability dates from December 2, 2010.[11]  He has both a Bachelor's and a Master's Degree.[12]  Plaintiff has past relevant work as a teacher for approximately 14 years and as a heavy equipment operator for the Delaware Army National Guard for over 22 years.[13]  Plaintiff was called for active duty to serve in the Persian Gulf War under Operation Enduring Freedom from approximately January 2010 until December 2010 and was stationed in a remote

---

[4] D.I. 4-3 at 9-10; D.I. 17 at 5.
[5] D.I. 4-3 at 4.
[6] D.I. 4-2 at 11.
[7] D.I. 11 at 6.
[8] D.I. 10 at 1-2.
[9] D.I. 10; D.I. 16.
[10] D.I. 4-3 at 16.
[11] D.I. 11 at 6.
[12] D.I. 11 at 7.
[13] *Id.*

part of Afghanistan with a team whose assignment was to rebuild a viable community and government in the area.[14]  Upon returning from his tour of duty, plaintiff volunteered as a pole-vault coach at his son's high school.[15]  Additionally, plaintiff participates in Wound Warriors with his wife and daughter including a 10 mile walk in Washington, D.C. in 2012.[16]  On April 4, 2015, plaintiff was arrested for an altercation at a local bar and brandishing a multi-tool on the owner of the bar.  Plaintiff alleges this incident was due to his PTSD symptoms - specifically flashbacks.[17]  Plaintiff was also involved in an altercation with a VA doctor who would refuse to assist plaintiff complete paperwork because the doctor thought plaintiff was lying about and exaggerating his symptoms. Plaintiff became so enraged that he was escorted to the hospital by VA police and involuntarily committed to Meadow Wood Hospital for five days.[18]  Despite his prior vocational experience, plaintiff claims he remains disabled under the Act.[19]  To be eligible, plaintiff must demonstrate he is disabled within the meaning of §§ 216(i), 223(d), and 1614(a)(3)(A) of the Act.

### A.    Evidence Presented

### 1.    Musculoskeletal Impairments

Upon returning from his tour of duty in Afghanistan in December 2010, plaintiff sought treatment for bilateral bunions, low back pain, bilateral hip pain, neck and right shoulder pain, toenail fungus, derangement of his right knee, bilateral carpal tunnel

---

[14] D.I. 11 at 8.
[15] D.I. 17 at 6.
[16] *Id.*
[17] D.I. 4-3 at 25-27.
[18] D.I. 4-2 at 28; D.I. 4-3 at 37-40.
[19] D.I. 17 at 6.

syndrome, and bladder and bowel incontinence.[20]  Plaintiff first attempted to control

these physical impairments through conservative measures such as physical therapy,

pharmaceutical methods, trigger injections, and consulting specialized specialists, such

as a chiropractor.[21]

     In December 2010, plaintiff underwent a magnetic resonance imaging ("MRI")

scan which revealed lateral disc herniation and bulging discs at the L3-4 and L5-S1

levels.[22]  A second MRI performed on January 1, 2011 revealed a mild diffuse annular

bulge, disc herniation, and an annular tear at the L5-S1 vertebral disc.[23]  An x-ray

performed in February 2011 confirmed degenerative disc disease of the lumbar spine.[24]

Three subsequent MRI's in February, April, and May 2011 further confirmed this

diagnosis of multi-level degenerative disc disease. [25]  Dr. O'Rourke recommended

conservative treatment for this issue.[26]  On August 11, 2011, plaintiff underwent a

lumbar discectomy, laminectomy, and decompression at the L3-4 level.[27]  Following this

surgery, plaintiff underwent physical therapy for his back and neck and took pain

medication as needed.[28]  In April 2012, the record shows that plaintiff reported that his

pain was "much improved," with numbness continuing in his right thigh.[29]  He was using

---

[20] D.I. 17 at 1.
[21] D.I. 11 at 13.
[22] D.I. 4-2 at 21-22.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

a brace on "a regular basis but denied using any other assistive devices."[30]

Plaintiff contends that he suffers from neck pain due to accidents in Afghanistan.[31]  A January 2011 MRI of plaintiff's cervical spine indicated "mild C3-4 and C5-6 disc osteophyte complex and unconvertabral joint atrophy with neural foramina encroachment at C3-4 and C5-6, but no evidence of stenosis."[32]  A subsequent cervical MRI conducted in November 2011 "disclosed mild spondylitic changes, most severe at C5-6."[33]  On December 6, 2012, plaintiff was discharged from his physical therapy program for his neck and back for failure to keep appointments.[34]  In January 2013, plaintiff underwent a cervical fusion surgery "with hardware" in an attempt to correct his impairments.[35]

Plaintiff additionally complained of right shoulder pain.[36]   In December 2010, an MRI demonstrated a labral tear and mild acromioclavicular ("AC") joint osteoarthritis.[37]  A right shoulder arthrogram revealed a labral tear in May 2011.[38]  Ultimately, on March 19, 2012, plaintiff had a right shoulder arthroscopic repair with extensive debridement and subacromial bursectomy and decompression.[39]  During a doctor's visit on April 12, 2012, plaintiff was "feeling much better and was off narcotic pain medication."  He was

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] D.I. 11 at 24.
[36] D.I. 11 at 13.
[37] D.I. 4-3 at 22.
[38] *Id.*
[39] *Id.*

discharged from physical therapy because he "did not believe it was necessary."[40]

Plaintiff contends he has bilateral carpal tunnel syndrome.[41]  An electromyography ("EMG") nerve conduction study completed in December 2010 evidenced bilateral carpal tunnel syndrome, moderate on the right and mild to moderate on the left.  In examination, a tingling paresthesias was noted in both of his hands.[42] Plaintiff underwent left carpal tunnel release surgery on October 10, 2011 and right carpal tunnel release surgery on November 17, 2011.[43]  Dr. Bozentka, M.D. instructed plaintiff to avoid repetitive lifting and confirmed no heavy lifting due to the surgeries.[44] Bilateral x-rays conducted in November and December 2011 were within normal limits. An EMG nerve conduction study completed in October 2012 revealed mild bilateral carpal tunnel syndrome for which plaintiff was prescribed wrist splints to wear while driving and sleeping.[45]  A later x-ray in October 2013 showed no significant abnormalities of plaintiff's wrists.[46]

Plaintiff also contends he had painful feet in February 2012, which he rated as "a 2/10 in the right foot and a 4/10 in the left."[47]  He stated he uses a cane, mostly for navigating steps and curbs.  There is no indication in the record, however, that a cane is medically necessary "in light of normal neurological findings of full strength in the lower

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] D.I. 4-2 at 24.
[46] *Id.*
[47] *Id.*

extremities and no significant gait or balance disturbance."[48]  Further, "bilateral foot x-rays obtained in May 2011 failed to reveal any significant abnormalities."[49]  A left bunionectomy and right bunionectomies were performed respectively in April 2012, August 2013, and February 2014.[50]

Plaintiff claims he experiences fecal and urinary incontinence.[51]  His blood work results were normal and no imaging or diagnostic studies or procedures were performed.  Further, these conditions were found to ultimately have no impact on his ability to work.[52]  Additionally, plaintiff indicated that his bowel incontinence and bladder impairments were improving and stable with medication.[53]

Overall, numerous physicians have noted that plaintiff's physical symptoms and pain markedly improved over time with the proper treatment and medical regimen.[54]  In two follow up visits in February and March 2013, plaintiff admitted that his symptoms "significantly improved . . . denied any cervical pain" and the weakness in both of his hands was "improving."[55]  Plaintiff also told his physician that his "neck symptoms were much better since the surgery."[56]  Lastly, and most importantly, as early as December 2011, plaintiff "acknowledged that he was able to work but stated that he had too many appointments and wanted to concentrate on his physical needs."[57]

---

[48] *Id.* See also D.I. 4-3 at 20.
[49] D.I. at 25.
[50] *Id.*
[51] *Id.* See also D.I. 17 at 9.
[52] D.I. 4-2 at 25.
[53] *Id.*
[54] D.I. 4-2 at 26-27.
[55] *Id.*
[56] *Id.*
[57] D.I. 4-2 at 23.

## 2.      Mental Health Impairments

Plaintiff claims that he is unable to work primarily due to PTSD and the compounding TBIs he purportedly sustained during his tour of duty.[58]  On two occasions during training exercises, he was dropped on his head and while in actual combat in Afghanistan, his head was struck when his vehicle overturned.[59]  For all these incidences, he received medical treatment for a concussion.[60]  Plaintiff attributes his TBI as the cause for his short term memory loss and his inappropriate social behavior.[61]  During an examination on December 7, 2011, Dr. Thompson, Psy.D., noted plaintiff had "no difficulty with memory, attention, or concentration during the evaluation."[62]  On December 22, 2010, plaintiff was screened for TBI which was negative.  A global assessment function ("GAF") score[63] by Dr. Pramuka resulted in a score of 65.[64]  Another mental health examination conducted in February 2011 was within normal limits and, at the time, plaintiff had a GAF score of 70.[65]  About a year later, in February 2012, plaintiff was examined by Dr. Roya McCloskey, Psy.D., and was found to have a GAF

---

[58] D.I. 4-3 at 40.
[59] D.I. 4-3 at 9.
[60] D.I. 4-3 at 9, 34-35.
[61] D.I. 11 at 10.
[62] D.I. 4-2 at 18..
[63] The GAF is a scale ranging from zero to one hundred used by mental health professions to express an adult's psychological, social and occupational functions. A GAF score of 61 to 70 indicates some mild symptoms or only some difficulty in social, occupational or educational functioning; a score of 51 to 60 indicates mild symptoms or moderate difficulty in social, occupational, or educational functioning; and a score of 41 to 50 suggests serious symptoms or serious impairment in social, occupational and educational functioning.  American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders-Text Revision 34 (4th ed. 2000).
[64] D.I. 4-2 at 27.
[65] *Id.*

score of 60.[66]

Plaintiff contends that his PTSD is due to the many heinous atrocities he witnessed during his tour in Afghanistan.[67]  He attributes a particularly disturbing event - the gruesome death of his best friend - as the "birth of his mental health problems."[68] Plaintiff testified that he suffers from the hallmark symptoms of PTSD including flashbacks/recollections of his combat tour; periods of severe depression, anxiety, hypervigilance, irritability, and outbursts; thoughts of suicide; nightmares; and "bizarre night-time rituals including hollering out . . . frantically running through his home, and posturing himself as if he was aiming to fire a weapon."[69]  Overall, the record shows that plaintiff's mental symptoms have improved over time and with proper treatment.[70]

## B.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the September 12, 2014 hearing, plaintiff testified, without representation, about his past relevant work experience, his background, his time spent in Afghanistan on a tour of duty with the Army National Guard, and his alleged disabilities.[71]  Plaintiff is married and lives with his wife and two children.[72]  Plaintiff has both a Bachelor's and Master's Degree.[73]  He worked as a teacher for approximately 14 years and as a heavy

---

[66] D.I. 4-2 at 28.
[67] D.I. 11 at 8-9.
[68] *Id.*
[69] D.I. 11 at 10.
[70] D.I. 4-2 at 14-35.
[71] D.I. 4-3 at 2-75.
[72] *Id.*
[73] D.I. 4-3 at 2-75; D.I. 11 at 7.

9

equipment operator for the Delaware Army National Guard for over 22 years.[74]  Plaintiff stated that he went on a eleven-month tour of duty in Afghanistan from January 2010 until December 2010.[75] Plaintiff has not worked since returning from Afghanistan in December 2010.[76]

Plaintiff stated that his mental impairments, specifically his TBI, began in January 2010 after he was dropped on his head twice during a medevac training exercise, and suffered a concussion.[77]  Plaintiff further contends his TBI worsened during his tour of duty when his vehicle flipped upside down.[78]  After this incident, plaintiff claims he could not bend over to put on his boots the next day.[79]  Because of his TBI, plaintiff claims he has difficulty concentrating or remembering things.[80]  He admits, however, to driving "short distances" up to 5 days per week to his doctors appointments and to take his children to school.[81]

Plaintiff maintains his PTSD developed in response to the events and scenes that he witnessed during his tour of duty.[82]  He claims the PTSD is the major cause of his disability.[83]  His PTSD results in bouts of severe depression, socially-improper outbursts, trouble sleeping, flashbacks, and problems with authority.[84]  Plaintiff and his

---

[74] D.I. 11 at 7.
[75] Id.
[76] D.I. 11 at 17.
[77] D.I. 4-3 at 33
[78] D.I. 4-3 at 35.
[79] Id.
[80] D.I. 4-3 at 41.
[81] D.I. 4-3 at 42-43.
[82] D.I. 11 at 12.
[83] D.I. 4-3 at 80-81.
[84] Id.

wife maintain that PTSD lead to his involvement in a local bar, where plaintiff pulled a knife on the owner of the bar, culminating in his arrest.[85]  Plaintiff also contends PTSD caused an altercation with a VA doctor after that doctor accused plaintiff of lying about his symptoms and would not assist in completing the forms for special compensation and assistance from the U.S. Army.[86]  As a result, plaintiff was arrested by the VA police, and, committed to MeadowWood Hospital for a period of six days.[87]  Plaintiff testified that he bought and trained, a hunting dog for use as a service dog, with the help of a certified trainer and now uses the dog to address his PTSD.[88]  He recounted where his service dog completely alleviated his anxiety when he was in a crowded, unfamiliar public place.[89]

Plaintiff further testified that he sustained physical impairments as well as mental impairments as a result of his time spent in Afghanistan,[90]  specifically, lower back pain due to injuries incurred during his tour of duty and numbness in his right leg and has undergone corrective surgery.[91]

Plaintiff testified that he was trying to start a non-profit organization to help other wounded veterans,[92] but he was unable to complete the 501C application.[93]  Although plaintiff claims he "can mentally complete the form," he cannot physically force himself

---

[85] D.I. 4-3 at 65-67.
[86] D.I. 4-3 at 47-30.
[87] *Id.*
[88] D.I. 4-3 at 27-31.
[89] *Id.*
[90] D.I. 11 at 13.
[91] *Id.*
[92] D.I. 4-3 at 64-65.
[93] *Id.*

to complete the form.[94]

### 2.    Vocational Expert's Testimony

The vocational expert ("VE"), Christina Cody, testified about plaintiff's

background, skills, limitations, and the jobs available within his established restrictions.[95]

The VE classified plaintiff's past relevant work experience as a school teacher and a

heavy equipment operator as light exertional work with a specific vocational preparation

("SVP") rating of seven.[96]  During the hearing, the ALJ posed several hypothetical

situations to the VE regarding plaintiff's ability to find unskilled, sedentary work.[97]  All of

the hypothetical questions included an individual of the same age, and with the same

past work experience and education as the plaintiff.[98]  The ALJ included the following

additional limitations to the hypothetical questions of no climbing, no pushing or pulling,

no more than occasional overhead reaching or fingering, posturing activity and contact

with coworkers and supervisors, and no contact with the general public.[99]  The VE

identified three representative positions which plaintiff could perform including a type

copy examiner, an addressing clerk, and a document preparer.[100]  All these positions

have an SVP of two and are unskilled.[101]  The ALJ further asked the VE if a hypothetical

person, fitting plaintiff's situation, would be able to find competitive work if he were

absent three times per month for health reasons of any sort, to which the VE responded

---

[94] *Id.*
[95] D.I. 4-3 at 66-74.
[96] D.I. 4-3 at 67.
[97] D.I. 4-3 at 70-72.
[98] *Id.*
[99] D.I. 4-3 at 71.
[100] *Id.*
[101] D.I. 4-3 at 71-72.

no.[102]  The ALJ also inquired whether an individual who is experiencing flashbacks, and

as a consequence, loses concentration fifteen to twenty-five percent of the time, would

be able to find competitive work to which the VE answered in the negative.[103]  Finally, in

response to a question posed by plaintiff, the VE testified that a person who was in a

similar situation as the plaintiff is absent from work two to four times per week for

doctors' appointments was not employable.[104]

### 3.    Witness's Testimony (Mrs. Conley)

Tina Conley, plaintiff's wife, testified at the hearing that she is her husband's

legal care giver and is paid by the VA for this task.[105]  Mrs. Conley noted that plaintiff

has difficulty completing simple forms, such as an application for a new social security

card.[106]  She also testified that her husband habitually shreds important documents,

forgetting that he has done so or where he discarded the shredded documents.[107]  Mrs.

Conley also stated that plaintiff is socially awkward and/or inappropriate at times

because he has "little or no emotional connection to people or things" and is extremely

hypervigilant.[108]  She testified plaintiff's hypervigilance can become a "hyper-focused"

state, relating her husband sent e-mails at 3:00 a.m. because he is so focused on an

issue that he cannot sleep.[109]  Mrs. Conley also confirmed plaintiff was a voluntary pole-

vaulting coach with Salesianum High School, but was terminated for his conduct toward

---

[102] D.I. 4-3 at 72.
[103] *Id.*
[104] D.I. 4-3 at 74.
[105] D.I. 4-3 at 62.
[106] D.I. 4-3 at 51.
[107] D.I. 4-3 at 52.
[108] *Id.*
[109] D.I. 4-3 at 65.

an athlete and after his arrest for the bar altercation.[110]

Mrs. Conley related that the family vacationed in Florida and went on two camping trips through the Wounded Warrior Project.[111]  She also testified that plaintiff was able to travel without any difficulty.[112]

Mrs. Conley corroborated plaintiff's account of the cause of her husband's altercation at the restaurant, claiming it was the result of a flashback.[113]  She recognized from plaintiff's demeanor that he was experiencing a flashback and she unsuccessfully attempted to alleviate the situation.[114]  She was able, however, to remove the multi-tool from her husband's possession.[115]

Mrs. Conley claimed she lost her job in connection with plaintiff's outburst at the local bar.  After failing to comply with an order to stop by the police, plaintiff was tased.[116]  In response, she attempted to kick the taser from the officer's hand, which resulted in her arrest for second degree assault and with carrying a concealed deadly weapon.[117]  She concluded these charges resulted in the loss of her job, although her employment was at-will.[118]

Mrs. Conley does not believe plaintiff is employable because an un-skilled position would not be intellectually stimulating and would cause a deep depression.[119]

---

[110] D.I. 4-3 at 53-55.
[111] D.I. 4-3 at 62-63.
[112] *Id.*
[113] D.I. 4-3 at 59-60.
[114] *Id.*
[115] *Id.*
[116] D.I. 4-3 at 60-61.
[117] *Id.*
[118] *Id.*
[119] D.I. 4-3 at 56-57.

She further believed her husband would respond with rage if criticized by a supervisor or coworker.[120]  She further noted that all of plaintiff's triggers are unknown and he could respond very negatively for any reason.[121]

### 4.    The ALJ's Findings

Based on the medical evidence and testimony, the ALJ determined plaintiff was not disabled and, therefore, ineligible for Social Security Disability Insurance and Supplemental Security Income.  The ALJ's findings are summarized as follows:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since December 2, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments:  Major depressive disorder; posttraumatic stress disorder (PTSD); history of anxiety; back disorder with surgeries; neck disorder; knee disorder; bilateral carpal tunnel syndrome with release surgeries; shoulder disorder; bunions/left and right foot pain; bilateral elbow tendinitis; right elbow epicondylitis; occasional urinary and fecal incontinence; and traumatic brain injury (TBI) (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functioning capacity to perform sedentary work as defined in 20 CFR 404.1567(a), that is unskilled, with no more than occasional postural activities, but no climbing of ladders, ropes, or scaffolds, no kneeling, and no crawling, and no more than occasional use of ramps and stairs; no more than occasional interaction with coworkers and supervisors; no interaction with the general public; no more than occasional exposure to moving machinery; no work at exposed heights; no

---

[120] *Id.*
[121] D.I. 4-3 at 57-58.

pushing/pulling with the bilateral lower extremities; no more than occasional overhead reaching with the bilateral upper extremities; and no more than frequent fingering.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October 29, 1970 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart A, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 2, 2010, through the date of this decision (20 CFR 404.1520(g)).

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56(c).  In determining the appropriateness of summary judgment, the

court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of

the non-moving party[,]' but [refraining from] weighing the evidence or making credibility

determinations."[122]  If "there is no genuine issue as to any material fact" and the movant

is entitled to judgment as a matter of law, summary judgment is appropriate.[123]

This standard does not change merely because there are cross-motions for

summary judgment.[124]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.[125]

"The filing of cross-motions for summary judgment does not require the court to grant

summary judgment for either party."

### B.    Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision.  The court

may reverse the Commissioner's final determination only if the ALJ did not apply the

proper legal standards, or the record did not contain substantial evidence to support the

decision.  Factual findings are upheld if supported by substantial evidence.[126]

Substantial evidence means less than a preponderance, but more than a mere scintilla

of evidence.[127]  As the United States Supreme Court has found, substantial evidence

"does not mean a large or significant amount of evidence, but rather such relevant

---

[122] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)
(citation omitted).
[123] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R.
CIV. P. 56(c)).
[124] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[125] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[126] *See* 42 U.S.C. §§405(g); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d
1185, 1190 (3d Cir. 1986).
[127] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

evidence as a reasonable mind might accept as adequate to support a conclusion."[128]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record.[129]   The court's review is limited to the evidence that was actually presented to the ALJ.[130]   The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is overwhelmed
> by other evidence, particularly certain types of evidence (e.g., evidence
> offered by treating physicians) or if it really constitutes not evidence but
> mere conclusion.[131]

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[132]   Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence.[133]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[134]   In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by

---

[128] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).
[129] *Monsour*, 806 F.2d at 1190.
[130] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).
[131] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).
[132] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[133] *Monsour*, 806 F.2d at 1190-91.
[134] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).

the grounds invoked by the agency."[135]  "If those grounds are inadequate or improper,

the court is powerless to affirm the administrative action by substituting what it

considers to be a more adequate or proper basis."[136]  The Third Circuit has recognized

the applicability of this finding in the Social Security disability context.[137]  This court's

review is limited to the four corners of the ALJ's decision.[138]  In Social Security cases,

the substantial evidence standard applies to motions for summary judgment brought

pursuant to FED. R. CIV. P. 56.[139]

## IV.    DISCUSSION

### A.    Parties' Contentions

In his appeal, plaintiff contends the ALJ violated longstanding agency policy and

Circuit precedent by not giving appropriate deference to the opinions of his treating

sources - specifically Dr. Litle, M.D.  Plaintiff also alleges the ALJ's failure to develop the

medical record was a critical legal error due to his unrepresented status, which resulted

in an incomplete and unfair hearing.  Further, the ALJ committed legal error by failing to

determine if plaintiff was disabled for any twelve-month period due to his numerous

surgeries and medical appointments.  Finally, the plaintiff maintains the ALJ's residual

functioning capacity ("RFC") finding is legally deficient because it did not include all of

his established limitations.  The Commissioner counters:  the ALJ afforded proper

weight to the opinions of plaintiff's treating physician, plaintiff received a full and fair

---

[135] 332 U.S. 194, 196 (1947).
[136] *Id.*
[137] *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001).
[138] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[139] *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

administrative hearing, and his administrative record was fully developed, and substantial evidence supports the ALJ's RFC assessment.

### B.     Disability Analysis

Title II of the Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[140]  To qualify for DIB, a claimant must establish disability prior to the date he was last insured.[141]  A "disability" is defined as the "inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months."[142]  To be disabled, the severity of the impairment must prevent return to previous work, and, based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[143]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[144]  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.[145]  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required.[146]  If the claimant is not

---

[140] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[141] *See* 20 C.F.R. § 404.131.
[142] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[143] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[144] 20 C.F.R § 404.1520; see also *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[145] 20 C.F.R. § 404.1520(a)(4).
[146] 20 C.F.R. § 404.1520(a)(4)(I).

so engaged, step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe.  If no severe impairment or a combination thereof exists, a finding of non-disabled is required.[147]

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments ("the listings") that are presumed severe enough to preclude any gainful work.[148]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[149]  If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.[150]  At step four, the Commissioner determines whether the claimant retains the RFC to perform their past relevant work.[151]  A claimant's RFC is "that which an individual is still able to do despite limitations caused by [her] impairment(s)."[152]  "The claimant bears the burden of demonstrating an inability to return to [their] past relevant work."[153]

If the claimant is unable to return to their past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work.[154]  At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant

---

[147] 20 C.F.R. § 404.1520(a)(4)(ii).
[148] 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F. 3d at 428.
[149] 20 C.F.R. § 404.1520(a)(4)(iii).
[150] 20 C.F.R. § 404.1520(e).
[151] 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.
[152] *Fargnoli*, 247 F.3d at 40.
[153] *Plummer*, 186 F.3d at 428.
[154] 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 427-28.

Case 1:15-cv-00722-RGA  Document 20  Filed 06/20/16  Page 22 of 29 PageID #: 2862

national numbers and consistent with the claimant's medical impairments, age, education, past work experience, and RFC before denying disability benefits.[155]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert.[156]

### 1.   Weight of Dr. Litle's Opinion

Plaintiff avers that the ALJ committed legal error in not lending his treating physician, Dr. Litle, controlling or great weight in determining disability.[157]  In accordance with the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.[158] Corresponding with the regulations, the ALJ is not required to give controlling weight to conclusory medical opinions and the final responsibility in determining whether a claimant is disabled is reserved to the Commissioner.[159]  The determination of whether a plaintiff meets the statutory definition of disability is expressly reserved to the Commissioner.[160]  Substantial evidence supports the ALJ's decision to afford Dr. Litle's opinion little weight and the ALJ fully discussed his reasons for not giving this physician's opinion controlling weight.[161]  Despite Dr. Litle's opinion that plaintiff could not work, his opinion is inconsistent with other physicians' findings, assessed global

---

[155] *Plummer*, 186 F.3d at 427-28.
[156] *Id.*
[157] D.I. 11 at 14-20.
[158] 20 C.F.R. § 404.1527(c)(2).
[159] 20 C.F.R. § 404.1527(d)(1).
[160] *Id.*
[161] D.I. 4-2 at 32.

assessment functioning ("GAF") scores, as well as the plaintiff's medical record as a whole.[162]  The ALJ awarded Dr. Litle's medical opinion little weight due to its inconsistency with objective evidence and to plaintiff's GAF scores, indicative of mild to moderate symptoms or limitations.[163]  Furthermore, while the ALJ's observation of plaintiff alone cannot serve as the sole factor determining impairment, plaintiff's admitted daily activities and hobbies contradict Dr. Litle's opinion.  Specifically, plaintiff admitted to completing a 10-mile walk, without assistance, and to driving four to five times per week.[164]  These two activities directly contradict Dr. Litle's opinion that plaintiff is disabled due to PTSD and TBI and that plaintiff struggles with crowded places and has trouble concentrating and remembering things.  Dr. Litle's opinion is also inconsistent with the record as a whole because the plaintiff, his wife, and several examining physicians noted marked improvement of his symptoms after treatment.[165]  In addition, Drs. Yacoub and Desrosiers reported in clinic notes normal mental status examination findings, including normal memory, concentration, and attention.[166]  Despite the fact that Dr. Litle is plaintiff's mental health coordinator and has treated plaintiff on multiple levels including group, individual, and marital therapy, the evidence proffered by Dr. Litle directly conflicts with evidence from other treating and non-treating sources.[167]  Since there is adequate conflicting medical evidence and testimony on record, from the plaintiff, his wife, and numerous physicians, the ALJ did not err in affording Dr. Litle's

---

[162] *Id.*
[163] *Id.*
[164] D.I. 4-3 at 21-23, 42-43.
[165] *Id.*
[166] *Id.*
[167] D.I. 11 at 15-16.

opinion little weight.

Plaintiff also contends that the ALJ erred in not affording the VA's own 100%

disability rating great weight.  It is firmly established policy that the Commissioner's

determination of disability should not be based entirely from another agency's ruling and

that the Commissioner has the ultimate responsibility of determining a claimant's

disability status.[168]  In determining whether an individual is disabled, the ALJ "will

consider the medical opinions in [the] case together with the rest of the relevant

evidence . . . ."[169]  According to well-established SSA guidelines, a "determination made

by another agency that [the claimant is] disabled . . . is not binding on [the SSA]."[170]

Based on these regulations, the ALJ did not commit legal error by affording the VA's

100% disability rating little or no weight in his determination of plaintiff's disability status.

### 2.    Development of Medical Record

Plaintiff asserts that the ALJ committed legal error by not fully developing the

medical record for a *pro se* litigant.[171]  The ALJ has a heightened level of care and

responsibility to assume a more active role when the claimant is unrepresented.[172]

However, the ALJ is not required to act as claimant's counsel.[173]  Therefore, the ALJ

does have a duty to develop the medical record, but that duty only arises when there is

insufficient evidence to make a rational decision.[174]  When a claimant voluntarily elects

---

[168] 20 C.F.R. § 404.1527.
[169] 20 C.F.R. § 404.1527(b).
[170] 20 C.F.R. § 404.1504
[171] D.I. 11 at 15-23.
[172] *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979).
[173] *Clark v. Shalala*, 28 F.3d 828 8th Cir. 1994).
[174] *Id.*

to proceed without counsel, after being fully informed of his right to have counsel present, the proper inquiry is whether the unrepresented claimant suffered "clear prejudice or unfairness" in the administrative proceeding.[175]  Lack of counsel alone is not sufficient for remand.[176]  The ALJ thoroughly explained to plaintiff his right to representation at the administrative hearing and confirmed plaintiff understood this right.[177]  After acknowledging that he understood this right, plaintiff elected to continue with the hearing without representation.[178]  It is the claimant who bears the burden of proof to show that he or she is disabled or blind.[179]  The ALJ elicited testimony from plaintiff, his wife, and VE regarding his impairments, the extent those impairments affected his ability to work, and any medication or treatment he received for those impairments.[180]  The ALJ allowed plaintiff to ask the VE questions regarding her testimony and to clarify unfamiliar terms.[181]  Lastly, the ALJ held the record open for an additional two weeks to allow plaintiff to submit additional evidence that plaintiff deemed illustrative of his alleged disabilities.[182]  Since there was substantial medical evidence in the record to make a disability determination, the ALJ fully discharged his duty to develop the record and enabled plaintiff to receive a full and fair administrative hearing.

### 3.    12-month Disability Finding

Plaintiff claims that the ALJ committed legal error by failing to determine if the

---

[175] *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979).
[176] *Domozik v. Cohen*, 413 F.2d 5, 9 (3d Cir. 1969).
[177] D.I. 4-3 at 4.
[178] *Id.*
[179] 20 C.F.R. § 404.1512.
[180] D.I. 4-3 at 2-76.
[181] D.I. 4-3 at 73-75.
[182] *Id.*

plaintiff was disabled for any 12-month period due to his numerous surgeries and medical appointments.[183]  It is noteworthy that defendant does not address this allegation at all in her brief.[184]  The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which is expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[185]  As stated in Third Circuit case law:  "the ability to engage in substantial gainful employment . . . means more than the ability to do certain . . . physical and mental acts required in the job; the claimant must be able to sustain the activity through continuous attendance in a regular work-week."[186]  A "regular and continuing basis" means eight hours per day, for five days per week, or an equivalent work schedule.[187]  Specifically, plaintiff asserts that due to his nine surgeries, subsequent recovery time, and hospitalizations starting in August of 2011 and ending in February of 2014, he was disabled for at least a 12-month period under the definition provided by the Act.[188]  Further, plaintiff states that he has anywhere from two to seven doctors appointments per week which are mandated by the VAMC under his Wounded Warrior Program and this number of appointments would be unconducive to employment.[189]  Additionally, the VE confirmed that she did not believe that an

---

[183] D.I. 11 at 23.
[184] D.I. 18 at 9.
[185] 42 U.S.C. § 423(d)(1)(A).
[186] 20 C.F.R. § 404.1545(b); see also *Kangas v. Bowen* 823 F.2d 775 (3d Cir. 1987).
[187] S.S.R. 96-8p, 1996 WL 374184.
[188] D.I. 11 at 24.
[189] *Id.*

individual who had to miss work two to four times per week was employable.[190] The VE further testified that someone who missed work only three times per month for doctors' appointments would not be able to find competitive employment.[191] The testimony regarding plaintiff's numerous medical appointments, surgeries, and hospitalizations was neither refuted nor addressed by both the ALJ and defendant.[192] Additionally, when plaintiff asked the VE if an individual, who had to miss work two to four times per week for doctors' appointments would be able to find and hold a job, the VE replied "no."[193] Since the ALJ did not adequately discuss his reasoning for essentially ignoring plaintiff's contention about being disabled for a 12-month period due to his numerous surgeries and doctors appointments is grounds for remand on this issue.

### 4. RFC Assessment

Plaintiff alleges that the residual functional capacity ("RFC") finding is legally deficient because it did not include all of his established limitations.[194] An RFC is an individual's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.[195] It is a measure of an individual's maximum remaining ability to do sustained work activities in an ordinary work setting.[196] In assessing an individual's RFC, the ALJ "must consider only limitations and restrictions attributable to medically determinable impairments.[197] Furthermore, the RFC assessment must be

---

[190] D.I. 4-3 at 74.
[191] D.I. 4-3 at 72.
[192] D.I. 18 1-11; D.I. 4-2 14-42.
[193] D.I. 4-3 74.
[194] D.I. 11 at 20.
[195] 20 C.F.R. 404.1520(e) and 404.1545; SSR 96-8p.
[196] S.S.R. 96-8p.
[197] *Id.*

based on all of the relevant evidence in the case record.[198]   In assessing an individual's

RFC, the ALJ must consider "limitations and restrictions imposed by all of an individual's

impairments, even those that are not 'severe'".[199]   In determining an individual's RFC, the

ALJ must follow a sequential process and list reasons for his determination to include or

exclude limitations.[200]   The psychiatric review technique form "("PRTF") "requires

adjudicators to assess an individual's limitations and restrictions from a mental

impairment(s) in categories identified in the 'paragraph B' and 'paragraph C' criteria of

the adult mental disorders listings."[201]   However, these limitations are not an RFC

assessment, but are instead used to evaluate the severity of the alleged mental

impairments in earlier steps.[202]

In considering the plaintiff's RFC, the ALJ took into consideration every functional

limitation which he found pertinent.[203]   Further, it is evident from the record of the ALJ's

findings that he followed each step and evaluated the evidence before him in line with

Agency regulations.[204]   The ALJ has considered impairments or combination of

impairments that meet or medically equals the severity of one of the listed impairments in

20 C.F.R. 404, Subpart P, Appendix 1 and found that plaintiff did not have an impairment

or combination of impairments that satisfied this requirement.[205]   Therefore, the ALJ did

not commit legal error by not including any severe or non-severe impairments in

---

[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] D.I. 4-2 at 17-19.
[204] D.I. 4-2 at 17-19; SSR 96-8p.
[205] 20 C.F.R. 404, Subpart P, Appendix 1; D.I. 4-2 at 17.

determining that plaintiff is able to perform sedentary work within the applicable limitations.

## V.      CONCLUSION

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 10) be denied; and

(2) Defendant's motion for summary judgment (D.I.16) should be granted in part and denied in part; and

(3) The matter should be remanded to the Administrative Law Judge for further clarification regarding plaintiff's 12-month disability period.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: June 20, 2016                          /s/ Mary Pat Thynge
                                             Chief United States Magistrate Judge